OPINION OF THE COURT
Daniel P. Conviser, J.
Introduction
Multiple trial courts have wrestled with the question of whether the results of a test which has been approved as valid to measure a defendant’s blood alcohol content but is adminis *684 tered at the scene of a vehicle stop, rather than at a police precinct with all of the traditional protocols of a chemical test, is admissible at trial. At least four trial courts have held that the results of such “portable breath tests” (PBTs) are never admissible at trial. (See People v Reed, 5 Misc 3d 1032[A], 2004 NY Slip Op 51662[U] [Sup Ct, Bronx County 2004, Tallmer, J.]; People v Santana, 31 Misc 3d 1232[A], 2011 NY Slip Op 50962[U] [Crim Ct, NY County 2011, Simpson, J.]; People v Schook, 16 Misc 3d 1113[A], 2007 NY Slip Op 51411[U] [Suffolk Dist Ct 2007, Alamia, J.]; People v Harper, 18 Misc 3d 1107[A], 2007 NY Slip Op 52463[U] [Just Ct, Dutchess County 2007, Steinberg, J.].) At least two other courts have held that such tests are admissible, so long as proper foundational requirements are met. (See People v Jones, 33 Misc 3d 181 [Crim Ct, NY County 2011, Mandelbaum, J.]; People v Hargobind, 34 Misc 3d 1237[A], 2012 NY Slip Op 50450[U] [Crim Ct, NY County 2012, Gerstein, J.].)
This court proposes a third alternative. In the court’s view, the provisions of the Vehicle and Traffic Law and the inherent difficulty of producing reliable chemical test results at the scene of a car stop indicate that such tests should be presumptively inadmissible to prove a defendant’s guilt at trial. However, where the People can meet the threshold requirements for the admissibility of such evidence and, in addition, prove by clear and convincing evidence that such results bear the hallmarks of a reliable chemical test, those results should be admitted. The court proposes a five-factor test to evaluate whether that second requirement has been met. In this case, although the People met the threshold requirements for the admissibility of the PBT, the People fell far short of establishing that the PBT bore the indicia of a reliable chemical test. For that reason, the People’s application to admit the results of that test at trial were denied.[1]
*685 Statement of Facts
Testimony of Officer Jonathan Re
The defendant was arrested for driving while intoxicated (DWI) at 4:17 a.m. on July 11, 2010 in the vicinity of 16th Street and the West Side Highway in New York County by Officer Jonathan Re of the New York City Police Department (NYPD). Officer Re is a 14-year NYPD veteran. He testified that he was in a marked patrol car when he observed the vehicle the defendant was driving go through a stop sign at Gansevoort Street and 10th Avenue in New York County at approximately 4:00 a.m. This location is in the “Meat Packing District” of Lower Manhattan, an area which contains numerous clubs and bars. The defendant’s vehicle was traveling at approximately 10 to 15 miles per hour at the time.
The defendant then made a left turn onto 10th Avenue and a “hard right” onto the West Side Highway, going northbound. Officer Re said that the defendant’s driving with respect to this hard right turn could have resulted in a summons for dangerous driving since he appeared to have almost run into a highway barrier prior to turning right.[2] Officer Re and his partner Officer George McFall activated their lights and sirens and the defendant was pulled over a couple of blocks away. He testified that he did not suspect the defendant was under the influence of alcohol or drugs when he initially pursued him and that the defendant’s vehicle was generally operating normally.
Officer Re asked the defendant for his license and registration and the defendant complied. Upon being asked whether he had been drinking or was tired the defendant responded negatively. Officer Re detected the “strong odor” of alcohol. Mr. Aliaj was asked to step out of the vehicle and walk to the back of his car and asked whether he wanted to take a breath test, which the defendant agreed to. Prior to the breath test, Officer Re again asked the defendant if he had consumed alcohol and this time the defendant said he had consumed a “couple of drinks.” He also noticed at this point that the defendant had watery and red eyes.
The breath test device Officer Re used was the “CMI portable SD2” (hereinafter the SD2) which he said he had used about 65 *686 times before the instant arrest.[3] He received training in the use of this device in a one-day course during his first year as a police officer in 1998. Officer Re testified that he had never received any subsequent training in the use of the device, had never been trained in the use of the Intoxilyzer machine (discussed infra) and was not qualified to give a test using that or any other stationary alcohol measurement machine. He testified that he did not recall whether his 1998 training addressed the need to observe a subject for 15 to 20 minutes before measuring blood alcohol content. He also admitted that he was not now aware of any such requirement. He said that he did not recall whether he had received any instruction during his 1998 course on the impact of radio frequency interference (RFI) on breath test machines and that he was not qualified to give a physical coordination test.
The SD2 has a button which indicates whether it is calibrated. Officer Re testified that if this device reads anywhere from a .000 to a .003, it is properly calibrated. The machine has a yellow and a green light. When the yellow light is illuminated, it means that the subject is blowing into the instrument. The green light will go off when the subject has blown for the appropriate amount of time, which is 8 to 10 seconds. Once that green light goes off, the operator pushes a button and the result is registered. A subject blows into a straw which is unsealed before it is used. Officer Re testified that all of these procedures were properly followed.
Officer Re testified that he did not recall what the self-calibration record of the machine was on the date Mr. Aliaj took the test and had not made any record of it. He said the .000 and .003 were “all equivalent.”[4] The procedures he used in administering the SD2 test in this case were the same procedures he had used throughout his career. He said that he did not check prior to going on duty whether the SD2 machine had been calibrated within a reasonable period of time but did recall taking the machine to the Highway District during the year he arrested the defendant (presumably to be calibrated).
Approximately five minutes elapsed between the car stop at 4:00 a.m. and the SD2 test at 4:05 a.m. Officer Re testified that he did not ask Mr. Aliaj how he was feeling or whether he had *687 thrown up, burped or regurgitated prior to having him walk to the back of his vehicle for the test. He didn’t recall having ever received any training on those issues. Officer Re observed the defendant during this five-minute period but not for the purpose of detecting anything which might have impacted the test result. He did not observe the defendant belch or vomit during that time and did not remove any alcoholic beverages from Mr. Aliaj’s car.
The defendant registered a .11 on the test and was then placed under arrest. Mr. Aliaj had two cell phones with him when he was arrested. Officer Re had a two-way police radio on him at the time. The defendant was later transported to the police precinct, given Miranda warnings, answered questions, took three physical coordination tests and submitted to a chemical test using the Intoxilyzer 5000. The Intoxilyzer test occurred at 5:30 a.m. and resulted in a reading of .081. A videotape was made of the defendant’s performance on the physical coordination tests and the Intoxilyzer test. In the court’s view, the defendant’s performance on two of the three physical coordination tests was flawless. He made one mistake indicative of alcohol impairment on the third test. At the precinct, Mr. Aliaj reported that he had consumed two beers between 12:00 and 1:30 a.m. He said that he was in good health and did not require any medical treatment. Officer Re opined that the defendant was under the influence of alcohol on the morning of his arrest.
Officer Re testified that prior to taking an Intoxilyzer test, a subject must be observed for 20 minutes. He said that normally the arresting officer (in this case, Officer Re) would do arrest paperwork at the precinct and the arresting officer’s partner (in this case Officer McFall) would do the 20-minute observation. He said he believed that Officer McFall had observed the defendant for 20 minutes prior to the Intoxilyzer test but did not watch Officer McFall to see if that had occurred. Officer McFall did not testify at the trial.
Officer Re testified that he kept the SD2 in a bag in the back seat of his patrol car and did not recall the last time he had used it. The machine belongs to the precinct and is used in common by precinct officers. The People introduced two reports regarding the SD2 machine which indicated that it had been properly calibrated on April 22, 2010 and March 7, 2011. Officer Re testified that the device needed to be re-calibrated once a year. He said that the defendant did not have a number of other possible signs of intoxication during his encounter with him. *688 His clothes were not disheveled, he was not belligerent, he did not stagger or stumble on his feet, he did not slur his words and he was cooperative at all times.
Testimony of Officer Manuel Almanzar
Officer Manuel Almanzar testified concerning the Intoxilyzer 5000 test he gave the defendant at the 7th Precinct as an officer with the Intoxicated Driver Testing Unit (IDTU). In contrast to the 14-year-old one-day training course Officer Re received, Officer Almanzar said that he had received a one-week training course at the police lab to be certified as a breath analysis operator in 2007, had subsequently passed an examination and was then certified by the New York State Department of Health as a breath analysis operator. This certification lasted for two years, was then renewed and was valid at the time he gave the Intoxilyzer test. He was able to explain the workings of the Intoxilyzer 5000 in detail. He took another course on the technology in 2011 (after the arrest in this case). In order to be recertified, an operator must perform a certain number of breath tests.
The Intoxilyzer performs a self-calibration test when it is turned on. The People introduced a record of this self-calibration test and the defendant’s test result. The People also introduced records of two calibration tests and two field inspection reports concerning the machine on dates other than the arrest date. Officer Almanzar testified that he directed Officer Re to observe the defendant for 20 minutes prior to taking the Intoxilyzer test. Officer Almanzar said that a subject is observed to ensure that he does not have alcohol in his mouth and that if a subject eats, drinks, smokes, burps or vomits, the 20-minute period must start again. Officer Almanzar learned about these issues during his training course. He understood that an officer watching a suspect could not be distracted or leave the observation to attend to another task.
Officer Almanzar said that he goes through a 13-point checklist prior to administering the Intoxilyzer test. If the machine does not properly self-calibrate, it cannot function. He said that the Intoxilyzer 5000 could be subject to RFI if a radio was actually answered while transmitting information. Persons entering the IDTU were instructed to turn off radios and have cell phones on vibrate.
Testimony of Officer Adrian Arav
NYPD Officer Arav testified that he was a state certified technical supervisor who was responsible for Health Department cards, the testing of machines and the training of officers *689 at the IDTU. He said he had been with the IDTU for four years. He said that the 28 Intoxilyzer 5000 machines maintained by the NYPD are checked every 5 to 14 days and are calibrated every six months. Officer Arav testified that when the Intoxilyzer is turned on, it performs a self-diagnosis check and then goes through a sequence of events which includes three “air blank” checks to ensure that there is nothing in the room which might skew the test results.
He said that in New York a subject will take an alcohol test only once. A person’s temperature can affect a blood alcohol reading. For each rise of one degree Celsius, the blood alcohol reading will increase by .007. A person with a temperature of 100.4 degrees Fahrenheit would have this .007 rise in blood alcohol as compared to a person’s normal temperature. He said that the Intoxilyzer 5000 can detect a spike in radio frequencies and if that occurs a test is aborted, an alarm sounds and a printout is generated because the test is “RFI inhibited.” This occurs if a transmission is made on an officer’s radio, but will not occur if a radio transmission is received. Cell phones won’t cause such a spike but walkie-talkie radios can.
Testimony of Herbert Leckie
Herbert Leckie testified as an expert witness on behalf of the defendant in, inter alia, breath analysis and the Intoxilyzer 5000. He has a law degree and is a former New Jersey State Trooper who trained other officers in performing alcohol breath tests. He outlined his extensive training and professional experience and currently works as a DWI consultant.
He said that the 20-minute rule was a “cornerstone” in breath testing. Various actions like belching or regurgitating would bring alcohol vapors into the mouth and could provide a skewed reading. He said the observation must be continuous and uninterrupted and cannot break for even a second or two, since a person could belch within that time. Adherence to the 20-minute rule was particularly important in a jurisdiction like New York which only has subjects take one breath test. In jurisdictions where two tests are performed, the two tests provide a safeguard to ensure that a temporary belch does not skew a sample. He said that a blood alcohol test without the 20-minute observation period was unreliable. He was not aware of features on the Intoxilyzer 5000 which would provide safeguards regarding the detection of mouth alcohol versus deep lung alcohol. He said that from his review of all of the discovery materials in the case, he did not believe that Mr. Aliaj was under the influence of alcohol on the arrest date.
*690 Mr. Leckie explained the differences between a subject’s blood alcohol content at the time of driving as opposed to the time a blood alcohol test was given, which in this case was IV2 hours later than the car stop. If a person consumes a large amount of alcohol just prior to being stopped, the subject may be more impaired at the time of a later test than at the time the subject was driving. Generally, a drink is absorbed into a person’s bloodstream on an empty stomach within 30 minutes. Food in the stomach can extend that period to up to 90 minutes. Alcohol is “burned off” by a person at a rate of roughly 15% per hour. So, depending upon many variables, the result of a blood alcohol test given a period of time after a subject is driving may be unreliable. The court found the factual testimony of all of the witnesses in this case to be credible although the court did not agree with certain conclusions various witnesses arrived at.[5]
Conclusions of Law
In Reed, Justice Tallmer outlined the ways in which the Vehicle and Traffic Law distinguishes “field tests,” designed to help determine whether there is probable cause to arrest a defendant for an alcohol related violation, from “chemical tests,” designed to provide admissible evidence of a defendant’s blood alcohol content at trial.[6] She noted that the Vehicle and Traffic Law contemplated that defendants normally would receive a field test to determine the presence of alcohol and then, after arrest, a chemical test to determine the amount of blood alcohol in a subject’s body. Allowing field test evidence to be admissible at trial, she held, would “do[ ] violence to this statutory scheme” and was contrary to the weight of judicial authority. (2004 NY Slip Op 51662[U], *7.) The court also held that the reason for distinguishing between the two tests was that “conditions surrounding a field test do not give the same assurance of reliability and accuracy as those in a controlled environment.” (2004 NY Slip Op 51662[U], *7.) Judge Simpson reached the *691 same conclusion in Santana. Reed, Santana and Schook all concerned the same SD2 test at issue here.
In Jones, on the other hand, Judge Mandelbaum held that the results of an otherwise valid chemical test are not rendered inadmissible “just because the device used to perform the test is capable of being moved.” (33 Misc 3d at 182.) Judge Mandelbaum held that chemical test admissibility depended upon whether the device used to perform the test ordinarily produced scientifically reliable results, was in good working order and had been properly used. A device was reliable when it was included in the Conforming Products List of Evidential Breath Alcohol Measurement Devices (the List) established by the National Highway Traffic Safety Administration (NHTSA), a list which is incorporated by regulations of the New York State Department of Health mandated by the Vehicle and Traffic Law. (See Vehicle and Traffic Law § 1194 [4] [c]; 10 NYCRR 59.4 [b].)
The portable device at issue in Jones, the court noted, the Intoximeter Aleo-Sensor FST, was on the List. Judge Mandelbaum acknowledged that the Vehicle and Traffic Law distinguished between field tests and chemical tests. He opined, however, that the statute cannot “reasonably be read to mean that a test cannot constitute a chemical test simply because it takes place in the field.” (33 Misc 3d at 185.) He noted that evidence of the reliability of the test in his case had been provided by calibration reports indicating the machine had been working properly. He further held that the officer who administered the test had been properly trained in the machine and had administered the test correctly. The operator did not have a Department of Health certification which authorized him to perform the test, Judge Mandelbaum noted, but such a certification was not required by the statute. The court also noted that the officer “may not have maintained a continuous observation of the defendant for 15 minutes prior to the test” but said that controlling authority clearly held that this went to the weight rather than the admissibility of the test evidence. (33 Misc 3d at 187.)
The court in Hargobind reached the same conclusion as the Jones court on the basic issue of whether the results of a PBT (the same model used in Jones) could be admitted at trial, but reserved decision on whether the test in that case would be admitted pending the presentation of foundational testimony by the People. The Hargobind court, however, imposed significantly greater admissibility requirements for the test than the Jones court. In addition to the requirements outlined in Jones, the *692 Hargobind court held that evidence that the device was purged prior to the test and that the 15-minute observation rule was complied with had to be provided. In addition, the court noted that it would analyze whether the subject was given the right to refuse the breath test and the interval which had elapsed between calibration tests.
Judge Gerstein indicated that he agreed to some extent with the Reed and Santana courts that the Vehicle and Traffic Law contemplated that tests given in the field were generally inadmissible. He also found significant the fact that while blood alcohol tests given at precincts were generally videotaped, no such records were kept of field tests. Given all of these considerations, Judge Gerstein observed, there appeared to be “several obstacles complicating the establishment of a foundation” for the admissibility of the field test evidence in the case. (2012 NY Slip Op 50450[U], *4.)
Court’s Conclusions Regarding the Appropriate Rule
Each of the trial court opinions cited, supra, makes important points. It is obvious that the Vehicle and Traffic Law presumes that breath test results obtained by police in the field will not be admissible at trial. The McKinney’s Commentary to the Vehicle and Traffic Law makes that point:
“This breath test, [the ‘field test’ under the Vehicle and Traffic Law] sometimes called a screening test, involves a portable machine which is used by the police on the road to determine whether there is alcohol present in the motorist being tested. This screening or breath test machine is used as a pass/ fail test and is basically reliable for the determination of some presence of alcohol in a person’s blood but not the actual percentage or concentration.” (Carrieri, Practice Commentaries, McKinney’s Cons Laws of NY, Book 62A, Vehicle and Traffic Law § 1194, at 337 [2011 ed].)
On the other hand, however, the statute governing the admissibility of chemical test results does not make a distinction between initial breath and later chemical tests. That statute (Vehicle and Traffic Law § 1195 [1]) says simply that the court “shall admit evidence of the amount of alcohol or drugs in the defendant’s blood as shown by a test administered pursuant to the provisions of section eleven hundred ninety-four” of the Vehicle and Traffic Law (which includes both tests administered at car stops and precincts). There is nothing in the Vehicle and *693 Traffic Law which explicitly provides that a valid chemical test administered at the scene of a car stop is inadmissible at a trial. In the court’s view, however, the current distinction between tests given at car stops and police precincts is a valid one. That distinction is not only based on the provisions of the statute. Even under the most optimal conditions, tests given in the field are prone to multiple possibilities for interference which may not exist at police stations.
Lighting conditions may vary. A police officer on the street must always be vigilant about his or her surroundings in a way which may not be necessary at a police station. The environment, whether the air, the possibilities for radio interference, the temperature or a location’s physical layout cannot be precisely controlled. A defendant, all things being equal, is more easily monitored at a precinct. Even beyond these inherent difficulties, the protocols used to administer PBTs, when compared to those used to perform traditional chemical tests, may be sorely lacking.
With those considerations in mind, the court proposes the following rule. Chemical tests given in the field should be presumptively inadmissible. Overcoming that presumption should involve a two-step inquiry. First, as Judge Mandelbaum outlined, the People must make a number of threshold showings. A device used to measure a defendant’s blood alcohol content must be on the approved “List” of alcohol measurement devices, unless the People demonstrate the reliability of a particular device at trial. The People must show that a machine was properly calibrated. The People must demonstrate that the test was properly given. (See People v Hampe, 181 AD2d 238 [3d Dept 1992]; People v Campbell, 73 NY2d 481 [1989].) To these threshold requirements, the court would add a fourth, which has not yet been discussed in the relevant case law.
A police officer can ask a motorist to submit to a “field test” whenever there is an accident or a violation of any provision of the Vehicle and Traffic Law. (Vehicle and Traffic Law § 1194 [1] [b].) Thus, running a red light, speeding or reckless driving can all serve as valid predicates for a field test, regardless of whether there is any suspicion that a motorist has been drinking. A “chemical test,” however, can only be given where a field test indicates the presence of alcohol or there are reasonable grounds to believe a motorist has committed an alcohol related violation.
If a police officer gives an initial breath test to a motorist, therefore, without having reasonable grounds to believe the *694 motorist has committed an alcohol related violation that test is a “field test.” Such a test is inadmissible no matter how reliable it might be. A police officer cannot administer a field test (based on a nonalcohol related traffic infraction, for example) and then, having obtained an inculpatory result, have that test admitted into evidence at the trial of a defendant as a “chemical test” the officer did not, at the time, have the right to administer. In the court’s view, the People met all of these threshold requirements for the admission of the SD2 results in this case. The SD2 is on the “List” of approved devices. It had been calibrated within the past year. The test was properly administered. The police had reasonable grounds to believe the defendant had committed an alcohol related violation when the test was given.
Once these threshold findings have been made, in the court’s view, a test given in the field should not be admissible unless there is clear and convincing evidence that the test has the same general indicia of reliability as a chemical test administered in a controlled environment. To make that determination, the court proposes a five-factor test which covers the parameters which distinguish unreliable field tests from reliable chemical tests. These factors concern the condition of the operator, the qualifications of the test giver, the reliability of the testing device, the manner in which the test was administered and the record of the test procedure.
1. Condition of the Operator: Adherence to the 15- or 20-Minute Observation Rule
Health Department regulations promulgated pursuant to the Vehicle and Traffic Law require a 15-minute observation period prior to taking a chemical test during which the subject “must not have ingested alcoholic beverages or other fluids, regurgitated, vomited, eaten, or smoked, or have placed anything in his/her mouth.” (10 NYCRR 59.5 [b].) If any of these events occur, an additional 15-minute period must begin (10 NYCRR 59.5 [b]). The NYPD requires a 20-minute observation period. In the court’s view, adherence to this requirement should be a prerequisite to the admissibility of a chemical test, since a failure to abide by it creates an unreliable result. Controlling authority, however, has repeatedly held that the failure of the police to continuously observe a defendant for a 10-, 15- or 20-minute period prior to a breath test goes only to the weight of such evidence and does not render it automatically inadmissible. (People v Williams, 96 AD2d 972 [3d Dept 1983]; People v Lebrecht, 13 Misc 3d 45, 51 [App Term, 2d Dept 2006]; People v Schuessler, 14 Misc 3d 30, 32 [App Term, 2d Dept 2006].)
*695 Here, this factor clearly weighed against admitting the PBT result. Officer Re not only failed to abide by the 20-minute rule — he was not even aware of it. Five minutes elapsed between the car stop and the PBT. But even during that time, Officer Re testified, he was not observing the defendant for the purpose of seeing whether he did anything which might skew the test result.[7]
2. Qualifications of the Test Operator
The Vehicle and Traffic Law provides that where a test operator possesses a Department of Health permit to perform a chemical test, that is “presumptive evidence” that an examination was properly given. (Vehicle and Traffic Law § 1194 [4] [c].) The statute also provides that a test by an operator not so qualified is not prohibited. Health Department regulations provide a standard instruction, certification and testing regime for breath analysis instrument operators. They require a minimum 24 hours of instruction, a passing score on a one-hour exam and the demonstration of proficiency on the instruments an operator will use. Permits must be recertified every two years.
These are not onerous requirements. They do, however, provide some assurance that operators are trained and qualified to give chemical tests. In the court’s view, if an operator has a Health Department certification or some equivalent level of training, this factor should weigh in favor of admitting test results. If operators do not possess such training or proficiency, however, that should weigh against admitting test results in a case. Here, this factor clearly weighed against admitting the test evidence. Officer Re testified that he took a one-day course on blood alcohol tests 14 years ago. His recollection of what he learned was understandably limited. Indeed, he did not even recall whether he had been trained on an issue so basic as the need to observe a defendant for 15 or 20 minutes prior to administering a chemical test.
3. Testing, Maintenance and Operation of the Testing Device
The differences between the testing and maintenance of the Intoxilzyer 5000 and the SD2 machines in this case were strik *696 ing.[8] Intoxilyzer 5000 machines are checked every 5 to 14 days by a state certified technical supervisor to ensure that they are in good working order. Technical supervisors are required to meet even more stringent educational requirements than breath analysis operators. The only thing the court learned about the SD2 in this regard was that it was kept in a bag in the back of Officer Re’s patrol car and was used in common by multiple officers at the precinct. The Intoxilyzer must go through a 13-point checklist before being operated. The SD2, in contrast, is apparently simply turned on, performs its own self-calibration test and is used.
Persons entering the IDTU are directed to turn off radios and place cell phones on vibrate. Officer Re did not attempt to implement any similar safeguards in the field. Indeed, it is not clear that such procedures could even be observed during a car stop. Officer Arav testified that the Intoxilyzer 5000 uses three “air blanks” at different intervals surrounding a test to ensure that there is nothing in a room which might skew a breath sample. No evidence was presented as to whether the SD2 has a similar feature. The Intoxilyzer 5000 can recognize a spike in radio frequencies and will abort a test if such a spike is detected. The court did not learn anything about whether the SD2 has a similar feature. Health Department regulations require that a “system purge” precede both the testing of a subject and a calibration test. (10 NYCRR 59.5 [c].) The court did not learn whether the SD2 complies with this feature. The Intoxilyzer machine is calibrated every six months. The SD2 in this case was calibrated annually.[9]
The Intoxilyzer machine as it is used by the NYPD’s IDTU has important safeguards to ensure that blood alcohol tests produce accurate results. The SD2 as it was used in this case, in the court’s view, lacked many of the minimal safeguards which would ensure its reliability. This factor, again, in the court’s view, argued against the test results’ admissibility.
*697 4. The Way the Test was Given
Courts should obviously review how an alcohol test was administered. In this case, the evidence appeared to be straightforward in that regard. Officer Re asked the defendant to blow into a straw, the defendant blew into the straw and the machine registered a result. This factor, alone among all of the others, in the court’s view, weighed in favor of admitting the test results.
5. Record of Test Results
Blood alcohol tests at police precincts, at least in New York County, appear to be uniformly videotaped. The same holds true for coordination tests. This is an important procedure which helps ensure the reliability of test results and allows factfinders to judge for themselves whether tests are properly performed and subjects are intoxicated. Tests done in the field, on the other hand, at least in New York County, are apparently not videotaped.
In this case, moreover, other records of the test were lacking. The results of the self-calibration test done by the SD2, for example, were not recorded. The records kept by the police should be considered in determining whether tests administered in the field are as reliable as traditional chemical tests. (See Hargobind, 2012 NY Slip Op 50450[U], *5 [lack of test videotape should affect the weight of test evidence].) The lack of testing records in this case weighed against the test’s admissibility.
These five factors in total, in the court’s view, did not provide clear and convincing evidence that the test administered at the defendant’s road stop had the indicia of a reliable chemical test. Therefore, the court held that the evidence was inadmissible at trial.
Conclusion
PBTs can provide more probative information about a defendant’s intoxication than later precinct tests because such portable tests are administered in closer proximity to the time a defendant was driving. This case provides the perfect example. The defendant here registered a .081 on the Intoxilzyer test. This was l\1000th of one percentum of blood alcohol above the legal limit for per se intoxication. That would be sufficient for conviction of the per se intoxication count, of course, if this reading reflected the defendant’s blood alcohol concentration (BAG) at the time he was driving. But the test was given IV2 hours after the defendant drove. His BAG may have been higher, *698 lower or the same when he was driving. Given this razor thin margin, the People were unable to prove beyond a reasonable doubt that Mr. Aliaj’s BAG was at least .08 an hour and a half before he was tested.
On the other hand, he registered a .11 when he was stopped. Had this test been admitted and credited, it would have proved that the defendant was per se intoxicated at the time he was driving. That test, however, was clearly unreliable. If district attorneys and police departments are serious about having blood alcohol tests taken at the scenes of car stops admitted into evidence, they will have to do more to conduct those tests reliably. They will have to ensure that defendants are properly observed prior to being tested and that tests are given by trained operators, using well maintained and serviced machines with thorough records.
Unless such procedures are used, courts should resist admitting unreliable evidence which is proffered as an afterthought because a screening test produces an inculpatory result as part of a procedure which was intended only to determine what the next steps in a car stop should be. There is also, obviously, a need for appellate guidance on this important issue. Trial courts have struggled with it for at least eight years and there is no clear modern rule which governs the standards for determining whether or under what circumstances PBTs given with today’s technology and protocols are admissible at trial. Everyone has an interest in ensuring that the rules for the admissibility of such tests, at least, are clearly understood and uniformly applied.

. The court initially ruled on this issue from the bench, with an indication that this written decision would follow. The defendant in this case was charged with driving while intoxicated, per se (driving with .08 of one percentum or more of alcohol in his blood, Vehicle and Traffic Law § 1192 [2]); driving while intoxicated, “common law” (Vehicle and Traffic Law § 1192 [3]) and driving while ability impaired (Vehicle and Traffic Law § 1192 [1]). After a bench trial conducted by this court, he was acquitted of the two driving while intoxicated counts and convicted of the driving while impaired count. The instant statement of facts focuses on facts relevant to the admissibility of the PBT.

. The defendant was charged with three alcohol related offenses but not cited for running a stop sign or dangerous driving. Officer Re’s paperwork reflected the DWI and stop sign violations, but had no notations regarding dangerous driving.

. The transcript indicates that Officer Re referred to this device as the “DS2.” The People point out, however, that the device is actually called the “SD2.” The correct name is used here.

. May 3, 2012 trial transcript at 87, lines 22-23.

. The court did not credit Officer Re’s conclusion that the defendant was driving recklessly when he made a right turn onto the West Side Highway, Mr. Leckie’s opinion that the defendant was not under the influence of alcohol or certain assessments Officer Almanzar provided (not discussed here) of the defendant’s performance on the physical coordination tests and condition.

. For purposes of this decision, the court has used the shorthand “alcohol related violation” to refer to any offense for driving under the influence of alcohol pursuant to Vehicle and Traffic Law § 1192. PBT issues relevant to determinations of whether drivers under the age of 21 have consumed alcohol where no alcohol related violation is charged are not addressed here. (See Vehicle and Traffic Law §§ 1192-a, 1194 [2] [1]; § 1194-a.)

. The commentary here is not intended as a criticism of Officer Re. His testimony gave the court no reason to believe he is anything other than a fine police officer. It is offered to show that while Officer Re was trained and qualified to give Mr. Alia] a field test, he was not trained or qualified to give him a chemical test.

. The People presented much more detailed evidence at the trial concerning the Intoxilyzer machine than they did regarding the SD2. It is possible that the SD2 had additional reliability features which the court simply did not learn about.

. It should be noted that the Court of Appeals has held that the standard with respect to the operation of a breath test device is whether the machine is in “proper working order” and has specifically rejected the notion that a breath test machine must be calibrated once every six months. (People v Boscic, 15 NY3d 494, 498 [2010].)